21699 155

551

**QUITCLAIM DEED**

I, Louis A. Kunian, Trustee of 177 Perham Street Realty Trust u/d/t dated June 28, 1994, recorded with Suffolk District Registry of Deeds in Book 19331, Page 180, of Suffolk County, Massachusetts

for nominal consideration paid, and in full consideration of $1.00 Dollars

grant to Louis A. Kunian, Individually, of 177 Perham Street, West Roxbury, Suffolk County, Massachusetts

WITH QUITCLAIM COVENANTS

The land in said West Roxbury, Suffolk County, Massachusetts, together with the buildings thereon, situated at and known as 177 Perham Street, bounded and described as on Exhibit "A" attached hereto and incorporated herein by reference.

For title, see deed of Louis Kunian, dated June 28, 1994, recorded with said Registry of Deeds in book 19331, Page 191. See also confirmatory deed of even date, to be recorded herewith.

WITNESS my hand and seal this 27th day of August, 1997.

Witness: [signature] — [signature] Louis A. Kunian, Trustee of 177 Perham Street Realty Trust

COMMONWEALTH OF MASSACHUSETTS

Norfolk, ss. August 27, 1997

Then personally appeared the above named Louis A. Kunian, Trustee as aforesaid as aforesaid and acknowledged the foregoing instrument to be his free act and deed, before me.

[signature]
Russell E. Sampson, Jr., Notary Public
My commission expires: 04/07/00

PROPERTY ADDRESS: 177 Perham Street, West Roxbury, MA 02132

SUFFOLK REGISTRY OF DEEDS
REC'D ... ATTEST
SEP 2 3 42 PM '97
Paul R. Tierney
REGISTER

...n, Perman, Leavitt & Rubin, P.A.
..., Newbury Street
Danvers, MA 01923

CH58426

EXHIBIT A

21699 156

EXHIBIT A

The land at 177 Perham Street, West Roxbury, Suffolk County, Massachusetts being shown as Lot 133 and a portion of Lot 132 on a plan entitled "Plan of Land, Boston, Mass." (West Roxbury District), by George C. Hallisey, Surveyor, dated December 11, 1954, recorded with Suffolk County Registry of Deeds, Book 7028, Page 38, bounded and described as follows:

SOUTHWESTERLY by Perham Street, sixty (60) feet;

NORTHWESTERLY by a portion of Lot 132 on plan recorded with Suffolk County Registry of Deeds, Book 1774, Page 111, seventy (70) feet;

NORTHEASTERLY by a portion of said Lot 132, nine (9) feet;

NORTHWESTERLY again by a portion of said Lot 132, fifty-five (55) feet;

NORTHEASTERLY by land of owners unknown, fifty-one (51) feet;

SOUTHEASTERLY by land of owners unknown, one hundred twenty-five (125) feet.

SAID PREMISES ARE SUBJECT TO THE FOLLOWING ENCUMBRANCES:

1. Title to and rights of the public and others in so much of the premises as lies within the bounds of Perham Street.

21699 157

552

Dropkin, Perlman, Leavitt & Rubin, P.A.
89 Newbury Street
Danvers, MA 01923

CH58426

---------------------- [Space Above This Line For Recording Data] ----------------------

# MORTGAGE

[redacted]

THIS MORTGAGE ('Security Instrument') is given on August 26, 1997.
The Mortgagor is LOUIS A. KUNIAN , INDIVIDUALLY,

of 177 PERHAM STREET, WEST ROXBURY, MA 02132 ('Borrower').
This Security Instrument is given to CHOICE MORTGAGE CORP. USA
which is organized and existing under the laws of STATE OF NEW HAMPSHIRE, and whose address is
410 AMHERST STREET, SUITE 200, NASHUA, NH 03063 ('Lender').
Borrower owes Lender the principal sum of Sixty nine thousand and 00/100 Dollars
(U.S. $ 69,000.00). This debt is evidenced by Borrower's note
dated the same date as this Security Instrument ('Note'), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on September 2, 2027. This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, with power of sale, described property located in SUFFOLK County, Massachusetts:

See exhibit A attached hereto and made a part hereof.
For our Title see deed of even date recorded herewith.

SUFFOLK REGISTRY OF DEEDS
REC'D ENT'D & EXAM ATTEST
SEP 2 3 42 PM '97
Paul R. Tierney
REGISTER

which has the address of 177 PERHAM STREET, WEST ROXBURY, MA 02132 ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.



EXHIBIT B

tabbies

21699 158

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. Funds for Taxes and Insurance. Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items". Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Sec. 2601 et seq ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. Application of Payments. Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; forth. to principal due; and last, to any late charges due under the Note.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender: (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice indentifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5. Hazard or Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above. Lender, may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

21699 199

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

7. Protection of Lender's Rights in the Property. If Borrower fails to perform the covenants and agreements contained in this Security Instrument or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

8. Mortgage Insurance. If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceased to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9. Inspection. Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10. Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

11. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

21699 160

12. Successors and Assigns Bound; Joint and Several Liability; Co-signers. the covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. Loan Charges. If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit: and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Seurity Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15. Governing Law: Severability. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

16. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

17. Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If lender exercised this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period. Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. Borrower's Right to Reinstate. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occured; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action aaction as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's right in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occured. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

19. Sale of Note; Change of Loan Servicer. The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to the sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

20. Hazardous Substances. Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

21699 161

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specidied in the notice may result in acceleration of the sums by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the Statutory Power of Sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the Statutory Power of Sale, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by applicable law, in the manner provided by applicable law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by applicable law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

22. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

23. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

24. Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

X Adjustable Rate Rider
_ Graduated Payment Rider
_ Balloon Rider
_ Other(s) [specify]
_ Condominium Rider
_ Planned Unit Development Rider
_ Rate Improvement Rider
_ 1-4 Family Rider
_ Biweekly Payment Rider
_ Second Home Rider

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses: [signature: Russell E. Sampson Jr.]

[signature] (Seal)
LOUIS A. KUNIAN

Social Security Number ____________

____________ (Seal)

Social Security Number ____________

____________ (Seal)

Social Security Number ____________

____________ (Seal)

Social Security Number ____________

COMMONWEALTH OF MASSACHUSETTS, NORFOLK County ss:

On this 26th day of August, 1997 before me personally appeared LOUIS A. KUNIAN and acknowledged the foregoing to be his/her/their free act and deed.

My Commission expires: 04/07/00

[signature]
RUSSELL E. SAMPSON, JR. Notary Public

21699 162

# ADJUSTABLE RATE RIDER

**(LIBOR Index - Rate Caps)**

**THIS ADJUSTABLE RATE RIDER** is made this 27th day of August, 1997 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the Security Instrument) of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to CHOICE MORTGAG CORP., USA (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

177 Perham Street, West Roxbury, MA 02132

**[Property Address]**

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**1. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of 10.60 %. The Note provides for changes in the interest rate and the monthly payments as follows:

**2. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**
The interest rate I will pay may change on the 2nd day of March, 1998 and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *"The Wall Street Journal."* The most recent Index figure available as of the 15th day of the month 2 months prior to the month in which the Change Date occurs is called the "Current Index."

If the index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding percentage point(s) ( 6.90 %) to the Current Index. The Note Holder will then round the result of this addition to the next highest .125. Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than 11.60 % or less than 10.60 %. Thereafter, my interest rate will never be increased or decreased on any single Change

21699 163

Date by more than one percentage point (1.0%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 16.60 %, or less than 10.60 %

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**3. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 17 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**4. RESPONSIBILITY OF PERSONS UNDER THE NOTE**

If I am in default for any reason, you have the right to demand payment of the entire amount I owe you. If Lender requires payment in full or in the event of a foreclosure action, I agree to pay reasonable legal fees, principal and interest, costs and disbursements, allowances and additional allowances as may be awarded by any judgment of foreclosure and sale added thereto, and that such total amount shall be paid by me with interest, up to the day you actually receive such payment, even after a judgment of foreclosure and sale is granted.

**BY SIGNING BELOW,** Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

Date: August 27, 1997

[signature]
Louis A. Kunian

21699 164

# RIDER TO MORTGAGE

MONTHLY PAYMENTS FOR TAXES AND INSURANCE

1. Borrower's Obligations - Borrower agrees that upon 30 day written notice from Lender, Borrower will pay to Lender all amounts necessary to pay for taxes, assessments, leaseholds payments or ground rents (if any), and hazard insurance on the Property and mortgage insurance (if any). I will pay those amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless the law requires otherwise. I will make those payments on the same day that my monthly payments of principal and interest are due under the note.

Each of my payments under this paragraph 2 will be the sum of the following:

(i) One-twelfth of the estimated yearly taxes and assessments on the Property which under the law may be superior to this Security Instruments; plus
(ii) One-twelfth of the estimated yearly leasehold payments or ground rents on the Property; if any; plus
(iii) One-twelfth of the estimated yearly premium for hazard insurance covering the Property; plus
(iv) One twelfth of the estimated yearly premium for mortgage insurance (if any).
(v) One twelfth of the estimated yearly premium for flood insurance (if required).

Lender will estimate from time to time my yearly taxes, assessments, leasehold payments or ground rents and insurance premiums. Lender will use existing assessments and bills and reasonable estimates of future assessments and bills. The amounts that I pay to Lender for these items under this Rider to Mortgage will be called the "funds." These may be commingled with the funds of the Lender unless the law requires otherwise.

2. Lender's Obligation - Lender will use the funds to pay the above listed items. Lender will give to me, without charge, an annual accounting of the funds. That accounting must show all additions to and deductions from the funds and the reason for each deduction.

3. Adjustments - If Lender's estimates are too high or if taxes and insurance rates go down, the amounts that I pay under this Rider to Mortgage will be too large. If this happens at a time when I am keeping all of my promises and agreements made in this Security Instrument, I will have the right to have the excess amount either promptly repaid to me as a direct refund or credited to my future monthly payments of funds. There will be excess amounts if, at any time, the sum of (i) the amount of funds which Lender is holding or keeping, plus (ii) the amount of the monthly payments of funds which I still must pay between that time and the due dates of these items is greater than the amount necessary to pay the above listed items when they are due.

If, when payments of these items are due, lender has not received enough funds to make those payments, I will pay to Lender whatever additional amount is necessary to pay these items in full. I must pay that additional amount in one or more payments as Lender may require.

Louis A. Kunian

EXHIBIT 21699 165

The land at 177 Perham Street, West Roxbury, Suffolk County, Massachusetts being shown as Lot 133 and a portion of Lot 132 on a plan entitled "Plan of Land, Boston, Mass." (West Roxbury District), by George C. Hallisey, Surveyor, dated December 11, 1954, recorded with Suffolk County Registry of Deeds, Book 7028, Page 38, bounded and described as follows:

SOUTHWESTERLY by Perham Street, sixty (60) feet;

NORTHWESTERLY by a portion of Lot 132 on plan recorded with Suffolk County Registry of Deeds, Book 1774, Page 111, seventy (70) feet;

NORTHEASTERLY by a portion of said Lot 132, nine (9) feet;

NORTHWESTERLY again by a portion of said Lot 132, fifty-five (55) feet;

NORTHEASTERLY by land of owners unknown, fifty-one (51) feet;

SOUTHEASTERLY by land of owners unknown, one hundred twenty-five (125) feet.

SAID PREMISES ARE SUBJECT TO THE FOLLOWING ENCUMBRANCES:

1. Title to and rights of the public and others in so much of the premises as lies within the bounds of Perham Street.

2. Mortgage from Louis A. Kunian, Bernice T. Kunian and Arnold Kunian to Fleet Real Estate Funding Corp., dated October 9, 1992, recorded with said Registry of Deeds in Book 17773, Page 232.

21699 166

553

PROPERTY ADDRESS: 177 Perham Street, West Roxbury, MA 02132

PLEASE SEE EXHIBIT "A" ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE FOR A MORE PARTICULAR DESCRIPTION OF SAID PROPERTY.

STATUTORY ASSIGNMENT OF MORTGAGE

CHOICE MORTGAGE CORP. USA, having its usual place of business at 410 Amherst Street, Suite 200, Nashua, New Hampshire, holder of mortgage from

Louis A. Kunian

TO IT

in the original principal amount of $69,000.00

dated August 27, 1997

recorded with Suffolk District Registry of Deeds on

September, 1997, as Instrument No. ______

for consideration paid,

SEP 2 3 42 PM '97 SUFFOLK REGISTRY OF DEEDS REC'D ENT'D & EXAM ATTEST REGISTER

hereby assigns said mortgage and the note and claim secured thereby to

DELTA FUNDING CORPORATION
1000 WOODBURY ROAD
WOODBURY, NY 11797

SIGNED and SEALED as of this 27th day of August, 1997.

CHOICE MORTGAGE CORP. USA

BY: [signature]
Charles J. Buchter
Vice President of Operations

STATE OF NEW HAMPSHIRE

Hillsborough County, ss. August 27, 1997

Then personally appeared the above named Charles J. Buchter, Vice President of Operations as aforesaid and acknowledged the foregoing instrument to be the free act and deed of Choice Mortgage Corp. USA, before me.

Heather A. Bell
Heather A. Bell, Notary Public
My commission expires: 01/09/02

Perlman, Leavitt & Rubin, P.A.
69 Newbury Street
Danvers, MA 01923

CH58426

10 PA

EXHIBIT C

EXHIBIT A

The land at 177 Perham Street, West Roxbury, Suffolk County, Massachusetts being shown as Lot 133 and a portion of Lot 132 on a plan entitled "Plan of Land, Boston, Mass." (West Roxbury District), by George C. Hallisey, Surveyor, dated December 11, 1954, recorded with Suffolk County Registry of Deeds, Book 7028, Page 38, bounded and described as follows:

SOUTHWESTERLY by Perham Street, sixty (60) feet;

NORTHWESTERLY by a portion of Lot 132 on plan recorded with Suffolk County Registry of Deeds, Book 1774, Page 111, seventy (70) feet;

NORTHEASTERLY by a portion of said Lot 132, nine (9) feet;

NORTHWESTERLY again by a portion of said Lot 132, fifty-five (55) feet;

NORTHEASTERLY by land of owners unknown, fifty-one (51) feet;

SOUTHEASTERLY by land of owners unknown, one hundred twenty-five (125) feet.

SAID PREMISES ARE SUBJECT TO THE FOLLOWING ENCUMBRANCES:

1. Title to and rights of the public and others in so much of the premises as lies within the bounds of Perham Street.

2. Mortgage from Louis A. Kunian, Bernice T. Kunian and Arnold Kunian to Fleet Real Estate Funding Corp., dated October 9, 1992, recorded with said Registry of Deeds in Book 17773, Page 232.

35314 010

CITIZENS BANK

OPEN-END MORTGAGE
Home Equity Credit Line

539

THIS MORTGAGE (the "Security Instrument") is DATED 08/05/2004.
The mortgagor(s) is/are
LOUIS A KUNIAN

177 Perham St. West Roxbury, Mass.

Return To:
Citizens Bank
Consumer Loan Operations
One Citizens Drive
Riverside, RI 02915

SUFFOLK REGISTRY
RECEIVED & EXAMINED
2004 AUG 24 PM 1:50
REGISTER OF DEEDS

(the "Mortgagor"). This Security Instrument is granted to the Mortgagee
Citizens Bank of Massachusetts
a state-chartered bank organized under the laws of the state where the Lender has its principal place of business,
28 State Street, Boston, MA 02109 ("Lender").
This Security Instrument secures to the Lender (i) the repayment of the debt evidenced by a Home Equity Credit Line Agreement made in favor of the Lender by

LOUIS A KUNIAN

and dated as of 08/05/2004 (the "Agreement"), including, but not limited to, any future advances, with interest thereon, made to the maker(s) of the Agreement by the Lender under ***Paragraph 1*** below, (ii) all renewals, extensions and modifications of the Agreement, (iii) the payment of all other sums, with interest, advanced under ***Paragraph 9*** below to protect the security of this Security Instrument, and (iv) the performance of the covenants and agreements under this Security Instrument and the Agreement.

The Agreement is an adjustable rate consumer revolving loan agreement, pursuant to which the Lender has agreed to lend money to the Mortgagor from time to time pursuant to an open-end credit plan as defined in Section 1 of Chapter 140D of the Massachusetts General Laws.

32

The maximum amount secured by this Security Instrument is $ 35,000.00 of principal, plus interest thereon and all other charges and fees imposed by the Lender under the Agreement and this Security Instrument, including, but not limited to, amounts disbursed by the Lender under ***Paragraph 9*** below.

For this purpose, the Mortgagor, in consideration of the debt evidenced by the Agreement, does hereby mortgage, grant and convey to the Lender and the Lender's successors and assigns, with STATUTORY POWER OF SALE AND MORTGAGE COVENANTS, the following described property located in the County of SUFFOLK 150 R

Commonwealth of Massachusetts:

**"See attached legal description hereto and made a part hereof."**

which has the address of 177 PERHAM STREET, WEST ROXBURY, MA 02132

(the "Property Address");

TOGETHER with all the improvements now or hereafter erected on the property described above, and all easements, rights. appurtenances, fixtures and rents now or hereafter a part of or related to the property described above, all of which shall be deemed to be and remain a part of such property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing shall be referred to in this Security Instrument as the "Property."

353114 0

THE MORTGAGOR COVENANTS that the Mortgagor is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances expressly permitted by this Security Instrument. The Mortgagor warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances expressly permitted by this Security Instrument.

The Mortgagor and the Lender covenant and agree as follows:

**1. Open-End Mortgage.** This Security Instrument is an open-end mortgage and the Lender shall have all the rights, powers and protections to which the holder of any open-end mortgage is entitled, including, without limitation, all rights, powers and protections under Section 28B of Chapter 183 of the Massachusetts General Laws. The makers of the Agreement may borrow, repay and re-borrow such amounts as desired, subject to the terms and conditions of the Agreement. The amounts which the Mortgagor borrows and re-borrows under the Agreement shall be referred to in this Security Instrument as "Future Advances."

The Mortgagor agrees that each Future Advance shall be secured by and have priority under this Security Instrument as if such Future Advance were made as of the date this Security Instrument was recorded.

At no time shall the principal amount of the debt secured by this Security Instrument exceed the maximum principal amount of the Agreement, nor shall the maturity of Future Advances secured by this Security Instrument extend beyond the maturity date of the Agreement. All Future Advances shall be recorded on the books and records of the Lender.

**2. Future Advances Benefit Mortgagor Even If Mortgagor Is Not Also a Maker of the Agreement.** If a Mortgagor is not also a maker of the Agreement, such Mortgagor further agrees that (i) each Future Advance shall be considered as an advance for the benefit of such Mortgagor, and (ii) such Mortgagor shall be liable for the debt evidenced thereby, as if such Mortgagor had signed the Agreement; *provided, however,* that the extent of such Mortgagors liability for such debt shall be limited to such Mortgagor's interest in the Property, including, but not limited to, any rents, policies of hazard insurance maintained on the Property and any proceeds thereof, and any award of damages on account of any condemnation for public use of or injury to the Property. With respect to such Mortgagor only, the Lender agrees to look solely to the Property and such rents, policies, proceeds and condemnation awards in satisfaction of the debt secured hereby.

The Lender and any other Mortgagor or maker(s) of the Agreement may agree to extend, modify, forbear or make any other accommodations with regard to the terms of this Security Instrument or the Agreement without such Mortgagor's consent and without releasing such Mortgagor or modifying this Security Instrument as to such Mortgagor's interest in the Property.

**3. Payment of Principal and Interest.** The Mortgagor shall promptly pay when due the principal of and the interest on the debt evidenced by the Agreement, and all other fees and charges as provided in the Agreement, and the principal of and interest on any Future Advances secured by this Security Instrument. This Security Instrument secures payment of the Agreement according to its terms which are incorporated by reference into this Security Instrument.

**4. Application of Payments.** Unless applicable law requires otherwise, all payments received by the Lender under this Security Instrument and the Agreement may be applied to reduce amounts owing to the Lender from the Mortgagor and from the maker(s) of the Agreement in whatever order the Lender, in its sole discretion, chooses.

**5. Variable Rate.** The Agreement provides for changes in the rate of finance charge, as more particularly described in the Agreement. All references to interest in this Security Instrument shall be to the variable rate of finance charge set forth in the Agreement.

**6. Prior Mortgages and Deeds of Trust; Charges; Liens.** The following provisions concerning existing indebtedness ("the Senior Mortgage") are a part of this Mortgage. The lien of this Mortgage securing the indebtedness may be secondary and inferior to an existing lien. Grantor expressly covenants and agrees to pay, or see to the payment of, the Senior Mortgage and to prevent any default on such Senior Mortgage, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

The Mortgagor shall not modify, amend or extend the Senior Mortgage or the debt secured thereby without the written consent of the Lender. The Mortgagor shall pay or cause to be paid all taxes, assessments, and other charges, fines, and impositions attributable to the Property which may attain a priority over this Security instrument and leasehold payments or ground rents, if any.

The Mortgagor shall not allow any lien or encumbrance to attach to the Property, other than the lien for unpaid real estate taxes not yet due and payable (the "Accrued Taxes") and the Senior Mortgage. Without limiting the scope of the foregoing, the Mortgagor shall promptly discharge any lien, other than the Accrued Taxes and Senior Mortgage, which has priority over this Security Instrument unless the Mortgagor (i) in good faith contests the lien by, or defends against enforcement of the lien in, legal proceedings which, in the Lender's opinion, operate to prevent the enforcement of the lien or forfeiture of any part of the Property, and (ii) deposits with the Lender money or other security acceptable to the Lender to satisfy the amount of such lien. If the Lender determines that any part of the Property is subject to a lien prohibited under this Security Instrument, the Lender may give the Mortgagor a notice identifying the lien, and the Mortgagor shall satisfy the lien or take one or more of the actions described above within ten (10) days of the giving of notice.

**7. Hazard or Property Insurance.** The Mortgagor shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage", and such other hazards as the Lender may require, including without limitation, flood insurance. This insurance shall be maintained in such amounts and for such periods as the Lender may require. Without limiting the foregoing, this insurance shall be maintained in an amount no less than the maximum principal amount of the Agreement plus all amounts secured by mortgages which have priority over this Security Instrument, unless the replacement value of the Property is less than this sum, in which case this insurance shall be for the full replacement value of the Property.

Where appropriate, the Lender may require the Mortgagor to maintain insurance against rent loss in addition to the insurance described above.

The Insurance carrier providing the insurance shall be chosen by the Mortgagor subject to the Lender's approval which shall not be unreasonably withheld. All insurance policies and renewals shall be in form and content acceptable to the Lender, with such maximum deductible clauses as the Lender may require, and shall include a standard mortgagee clause in favor of and in a form acceptable to the Lender. The Lender shall have the right to hold the policies and renewals, subject to the terms of the Senior Mortgage.

All insurance policies and renewals shall provide that they may not be cancelled or diminished without ten (10) days' prior written notice to the Lender and not contain any disclaimer of the Insurer's liability for failure to give such notice. If the Lender requires, the Mortgagor shall promptly give to the Lender all receipts of paid premiums and renewal notices. In the event of loss, the Mortgagor shall give prompt notice to the Insurance carrier and the Lender. The Lender may make proof of loss if not made promptly by the Mortgagor.

Unless the Lender and the Mortgagor otherwise agree in writing, or unless otherwise required under the terms of any prior mortgage of record, casualty insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and the Lender's security is not lessened. If the restoration or repair is not economically feasible or the Lender's security would be lessened, the insurance proceeds shall be applied to the reduction of the indebtedness of the sums secured by this Security Instrument, whether or not then due, with any excess paid to the Mortgagor.

If the Mortgagor abandons the Property, or does not answer within thirty (30) days, a notice from the Lender that the insurance carrier has offered to settle a claim of insurance benefits, then the Lender may collect and apply the insurance proceeds. The Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The thirty (30) day period will begin when the Lender sends the notice to the Mortgagor.

Unless the Lender and the Mortgagor otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in ***Paragraph 3*** above or change the amount of the payments. If, under ***Paragraph 19*** below, the Property is acquired by the Lender, the Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to the Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

**8. Preservation, Maintenance and Protection of Property; Mortgagor's Loan Application; Leaseholds.** The Mortgagor shall keep the Property in good repair and shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste or permit any nuisance on the Property. The Mortgagor shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or the Lender's security interest.

The Mortgagor shall also be in default if the Mortgagor, during the loan application process, gave materially false or inaccurate information or statements to the Lender (or failed to provide the Lender with any material information) in connection with the loan evidenced by the Agreement.

The Mortgagor shall comply with all the provisions of any lease if this Security Instrument is on a leasehold. If the Mortgagor acquires fee title to the Property, the leasehold and the fee title shall not merge unless the Lender agrees to the merger in writing.

**9. Protection of Lender's Rights in the Property; Mortgage Insurance.** If the Mortgagor fails to perform the covenants and agreements contained in this Security Instrument promptly, or if there is a legal or administrative proceeding that, in the judgment of the Lender, may significantly affect the Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then the Lender may do or pay for whatever the Lender determines is necessary to protect the value of the Property and the Lender's rights in the Property. The Lender's actions may include paying reasonable attorneys' fees and entering (or causing its agent or independent contractor to enter) on the Property to make repairs. Although the Lender may take action under this ***Paragraph 9,*** the Lender does not have to do so.

Any amounts disbursed by the Lender under this ***Paragraph 9*** shall become additional debt of the Mortgagor secured by this Security Instrument. Unless the Mortgagor and the Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the variable rate of interest applicable to the Agreement, and shall be payable with interest, upon notice from the Lender to the Mortgagor requesting payment. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

If the Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, the Mortgagor shall pay the premiums required to maintain the mortgage insurance in effect until such time as the requirement for the mortgage insurance terminates in accordance with the Mortgagor's and the Lender's written agreement or applicable law.

**10. Inspection.** The Lender or its agent or independent contractor may make reasonable entries upon and inspections of the Property. The Lender shall give the Mortgagor notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**11. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of part or all of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to the Lender subject to the terms of the Senior Mortgage and any other mortgage, deed of trust or other security agreement with a lien which has priority over this Security Instrument.

In the event of a total taking of the Property, subject to the terms of the Senior Mortgage, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to the Mortgagor. In the event of a partial taking of the Property, unless the Mortgagor and the Lender agree in writing or otherwise required under the terms of Senior Mortgage, the proceeds shall at the option of the Lender be applied toward the amounts secured hereby in such order as the Lender may determine or toward the repair, rebuilding or restoration of the Property upon such conditions as the Lender may require, or toward both of such purposes.

If the Property is abandoned by the Mortgagor, or if, after notice by the Lender to the Mortgagor that the condemnor offers to make an award or settle a claim for damages, the Mortgagor fails to respond to the Lender within thirty (30) days after the date the notice is given, the Lender is authorized, subject to the terms of the Senior Mortgage, to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless the Lender and the Mortgagor otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in ***Paragraph 3*** above or change the amount of such payments.

**12. Mortgagor Not Released; Forbearance by Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by the Lender to any maker(s) of the Agreement or to any successors in interest of the Mortgagor or of any such maker shall not operate to release the liability of the original Mortgagor or Mortgagor's successors in interest. The Lender shall not be required to (i) begin proceedings against any maker(s) of the Agreement or successors in interest of the Mortgagor or of any maker(s) of the Agreement, (ii) refuse to extend time for payment, or (iii) otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original maker(s) of the Agreement or the Mortgagor or any successor in interest of the Mortgagor or of such maker. The Lender's forbearance in exercising any right or remedy shall not be a waiver of or preclude the exercise of any such right or remedy.

**13. Successors and Assigns Bound; Joint and Several Liability.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of the Lender and the Mortgagor, subject to the provisions of ***Paragraph 17*** below. The Mortgagor's covenants and agreements shall be joint and several.

**14. Notices.** Any notice to the Mortgagor provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address which the Mortgagor designates by written notice to the Lender. Any notice to the Lender shall be given by first class mail to Lender's address stated herein, or to any other address which the Lender designates by notice to the Mortgagor. Any notice provided for in this Security Instrument shall be deemed to have been given to the Mortgagor or the Lender when delivered, or two (2) business days following mailing as provided in this ***Paragraph 14.***

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Agreement conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Agreement which can be given effect without the conflicting provision. To this end, the provisions of this Security Instrument and the Agreement are declared to be severable.

**16. Mortgagor's Copy.** The Mortgagor shall be given one copy of the Agreement and of this Security Instrument.

**17. Transfer of the Property of a Beneficial Interest in the Mortgagor, Assumption.** If the Mortgagor sells or transfers all or any part of the Property or any interest in the Property, (or if a beneficial interest in the Mortgagor is sold or transferred and the Mortgagor is not a natural person) without the Lender's prior written consent, the Lender will terminate the Lender's commitment to make Future Advances and require immediate repayment in full of all sums secured by this Security Instrument, unless prohibited by applicable law. If Lender requires immediate payment in full under this paragraph, Lender will give mortgagor at least (30) days to make the required payment. The 30-day period will begin on the date the notice is mailed or delivered. If the mortgagor does not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving Mortgagor any further notice of demand for payment. Your rights under the Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives.

**18. Optional Reinstatement of Security Instrument by Lender.** Notwithstanding the Lender's acceleration of the sums secured by this Security Instrument, the Lender may, in its sole discretion, discontinue any proceedings begun by the Lender to enforce this Security Instrument at any time prior to entry of a judgment enforcing this Security Instrument if: (i) the Mortgagor pays the Lender all sums which would be then due under this Security Instrument and the Agreement, had no acceleration occurred, (ii) the Mortgagor cures all breaches of any other covenants or agreements of the Mortgagor contained in this Security Instrument and in the Agreement, (iii) the Mortgagor pays all reasonable expenses incurred by the Lender in enforcing the covenants and agreements of the Mortgagor contained in this Security Instrument and in enforcing the Lender's remedies as provided in ***Paragraph 19*** below, including, but not limited to, reasonable attorneys fees, (iv) the Mortgagor, at the sole option of the Lender, executes a Mortgage Agreement and Deed Modification Agreement which will adjust the rate of interest on the Agreement and will provide such other terms and conditions as the Lender shall specify, including, but not limited to, a termination of the rights of the Maker(s) of the Agreement to Future Advances, and (v) the Mortgagor takes such actions as the Lender may require to assure that the lien of this Security Instrument, the Lender's interest in the Property and the Mortgagor's obligation to pay the sums secured by this Security Instrument shall continue unimpaired. In the event that the Lender allows the Mortgagor to make such payments and cure this Security Instrument, this Security Instrument as modified and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred. Nothing in this ***Paragraph 18*** shall be deemed to require the Lender to allow the Mortgagor to cure this Security Instrument or otherwise discontinue any proceedings begun by the Lender to enforce this Security Instrument.

55314 014

**19. Acceleration; Remedies.** To the full extent permitted by law, upon a breach by the Mortgagor of any covenant in or condition of this Security Instrument or the Agreement or of any instrument executed in connection with this Security Instrument or the Agreement, or upon a breach by the Mortgagor of the Statutory Condition, the Lender may (i) require immediate payment in full of all sums secured by this Security Instrument without demand or notice, except as expressly prohibited by applicable law, and/or (ii) invoke the STATUTORY POWER OF SALE and any other remedies permitted by applicable law. The Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this ***Paragraph 19***, including, but not limited to, reasonable attorneys' fees, costs of title evidence, abstracts and title reports.

If the Lender invokes the STATUTORY POWER OF SALE, the Lender shall mail a copy of a notice of sale to the Mortgagor, and to other persons prescribed by applicable law, in the manner provided by applicable law. The Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by applicable law. The Lender or its designees may purchase the Property at any sale and/or sell the Property in one or more parcels, as the Lender, in its sole discretion, deems appropriate. The proceeds of the sale shall be applied in the following order: (i) to all expenses of the sale, including, but not limited to, reasonable attorneys fees, (ii) to all sums secured by this Security Instrument; and (iii) any excess to the person or persons legally entitled to it.

**20. Assignment of Rents.** The Mortgagor unconditionally assigns and transfers to the Lender all the rents and revenues of the Property. The Mortgagor authorizes the Lender or the Lender's agents and/or independent contractors to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to the Lender or the Lender's agents and/or independent contractors. However, prior to the Lender's notice to the Mortgagor of the Mortgagor's breach of any covenant or agreement in this Security Instrument, the Mortgagor shall collect and receive all rents and revenues of the Property. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If the Lender gives notice of breach to the Mortgagor: (i) all rents received by the Mortgagor shall be held by the Mortgagor as trustee for the benefit of the Lender only, to be applied to the sums secured by the Security Instrument; (ii) the Lender shall be entitled to collect and receive all of the rents of the Property; and (iii) each tenant of the Property shall pay all rents due and unpaid to the Lender or the Lender's agent on the Lender's written demand to the tenant.

The Mortgagor has not executed any prior assignment of the rents, except in favor of the holder of the Senior Mortgage, and has not and will not perform any act that would prevent the Lender from exercising its rights under this ***Paragraph 20***.

The Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to the Mortgagor. However, the Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of the Lender. This assignment of rents of the Property shall terminate when the debt secured by this Security Instrument is paid in full.

**21. Hazardous Substances.** The Mortgagor shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. The Mortgagor shall not do, or allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the lawful presence, use or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

The Mortgagor shall give the Lender prompt written notice of any investigation, claim, demand, lawsuit or other action by any governmental regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which the Mortgagor has actual knowledge. If the Mortgagor learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, the Mortgagor shall promptly take all necessary actions in accordance with applicable environment law.

As used in this ***Paragraph 21***, "Hazardous Substances" are those substances defined as toxic or hazardous substances by environmental law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this ***Paragraph 21***, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

**22. Loan Charges.** If the Agreement is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Agreement exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from Mortgagor which exceeded permitted limits will be refunded to Mortgagor. The Lender may choose to make this refund by reducing the principal owed under the Agreement or by mailing a direct payment to Mortgagor. If a refund reduces principal, the reduction will be treated as a partial prepayment under the Agreement.

**23. Legislation.** If enactment or expiration of applicable laws has the effect of rendering any provision of the Agreement or this Security Instrument unenforceable according to its terms, the Lender, at its option may (i) terminate its commitment to make Future Advances, (ii) require immediate payment in full of all sums secured by this Security Instrument, and/or (iii) invoke any remedies permitted by Paragraph 19 unless expressly prohibited by applicable law.

**24. Release.** Upon termination and discharge of the Agreement and all other sums secured by this Security Instrument, this Security Instrument shall become null and void and the Lender shall release this Security Instrument without charge to the Mortgagor. The Mortgagor shall pay any recordation costs.

**25. Waivers.** The Mortgagor waives all rights of homestead exemption in the Property and all rights of curtesy and dower in the Property.

**26. Condominium and Planned Unit Development Provisions.** In the event the Property is a unit or units of a condominium or a planned unit development, the Mortgagor hereby covenants and agrees to the following as additional conditions of this Security Instrument.

(a) The Mortgagor shall promptly pay the Mortgagor's share of common expenses and all assessments as required by the Constituent Documents as the same become due and payable, and shall fully and faithfully keep and perform each and every covenant, agreement, and provision in such Constituent Documents. As used herein, the term "Constituent Documents" shall mean the master deed or declaration establishing the condominium or planned unit development, the documents establishing the governing body of such condominium or planned unit development (the "Association") or any by-laws, rules, regulations, or resolutions adopted pursuant to either thereof.

(b) If there is in force a master insurance policy insuring the Property against loss from fire and other hazards customarily included in extended coverage insurance in an amount sufficient to provide the full replacement cost coverage of the Property (exclusive of land) in such amounts and for such periods as the Lender may require, such insurance (together with such casualty insurance on the contents of the units as the Lender may require) shall satisfy the Mortgagor's obligations to the Lender under ***Paragraph 7*** above relating to hazard or property insurance, unless the Lender requires the Mortgagor to maintain additional insurance. The Lender shall be entitled to require the Mortgagor to maintain such additional insurance if the Lender determines that the Mortgagor's percentage interest in the proceeds of such a master policy inadequately protects the Lender's interest or if for any other reason the Lender deems such additional insurance appropriate. In the event of a casualty loss to or taking of the condominium or planned unit development or to any of the units therein:

(i) The Mortgagor shall immediately notify the Lender of such loss or taking.

(ii) The Lender may elect to vote under the terms of and as provided in the Constituent Documents in place and stead of the Mortgagor with respect to all matters of repair and restoration of the same, and with respect to the disposition of the insurance proceeds or condemnation proceeds, and the Mortgagor hereby irrevocably appoints the Lender as the Mortgagor's attorney-in-fact so to vote, which appointment as attorney in fact is coupled with the Lender's interest in the Property.

(iii) The Mortgagor will make all advances as required by the Association for repair and restoration due to inadequacy of insurance proceeds or taking proceeds, provided that it has been voted to proceed with such repair and restoration.

(iv) The Mortgagor assigns to the Lender its right to receive any insurance proceeds or other funds payable as a result of damage or condemnation and not applied to a restoration and agrees to pay to the Lender any such funds received by the Lender which are received by the Mortgagor.

(v) The Mortgagor shall take such actions as may be reasonably necessary to insure that the Association maintains public liability insurance in amounts and such forms as are acceptable to the Lender.

(c) The Mortgagor shall promptly deliver to the Lender a true and full copy of each and every notice of default received by the Mortgagor with respect to any obligation of the Mortgagor under the Constituent Documents.

(d) The Mortgagor shall not vote for or consent to any modification of, or amendment to, or relaxation in the enforcement of any provision of the Constituent Documents, without the prior written consent of the Lender. The Mortgagor shall not vote to petition or subdivide the condominium or planned unit development or vote to (i) abandon or terminate the condominium or planned unit development, (ii) terminate professional management of the condominium or the planned unit development, or (iii) take action which would render the insurance coverages maintained by the Association unacceptable to the Lender without, in each case, the prior written consent of the Lender.

**27. Default** You will be in default under the Agreement if any of the following occurs, each of which constitutes a breach of a material obligation of yours under the Agreement:

(a) You fail to make any payment when due or to pay any charge or fee when due;

(b) Your action or failure to act adversely affects our security for your loan or a right we have in the security (an attempt by any other creditor to take money or other property of yours that is in our possession is an example of a failure to act that would adversely affect our security or security interest);

(c) A court determines that you are bankrupt or insolvent; or

(d) You gave or give us false or materially misleading information in connection with any extension of credit to you under your loan.

**28. Results of Default.** If you are in default, we may lower your credit limit, we may refuse to make any further advances under the Agreement, we may refuse to pay any outstanding checks that would require us to make an additional loan to you, we may foreclose on the real property described in this Mortgage securing your loan, we may take whatever other action is permitted under this Mortgage, and we may exercise any and all of our rights with respect to any other property securing your loan. We also may demand that you pay the full amount you owe on your loan immediately. After default, we may assess interest at the increased rate of 2 percent per month on the outstanding principal balance of your loan until all amounts due are paid in full.

**REQUEST FOR NOTICE OF DEFAULT AND FORECLOSURE UNDER SUPERIOR MORTGAGES OR DEEDS OF TRUST**

The Mortgagor and the Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Security Instrument to give notice to the Lender, at the Lender's address as stated herein, of any default under the superior encumbrance and of any sale or other foreclosure action.

BY SIGNING BELOW, the Mortgagor accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by the Mortgagor and recorded with it.

LOUIS A KUNIAN

35314 0117

## INDIVIDUAL ACKNOWLEDGMENT

STATE OR COMMONWEALTH OF MA )
)SS:
COUNTY OF SUFFOLK )

On the 12th day of August, 2004, before me appeared

**LOUIS A KUNIAN**

to me personally known to be the person(s) whose name(s) is/are subscribed to this Instrument, and such person(s) acknowledged that he/she/they (i) executed the same for the purposes therein contained, and (ii) executed this instrument as their free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

(Official Seal)

Kristina B. Magee
Notary Public
Print Name:
My Commission expires:

KRISTINA B. MAGEE, NOTARY PUBLIC
MY COMMISSION EXPIRES FEB. 2, 2007

## INDIVIDUAL ACKNOWLEDGMENT

STATE OR COMMONWEALTH OF ______________ )
)SS:
COUNTY OF ______________ )

On the __________ day of ______________, ________, before me appeared

to me personally known to be the person(s) whose name(s) is/are subscribed to this Instrument, and such person(s) acknowledged that he/she/they (i) executed the same for the purposes therein contained, and (ii) executed this instrument as their free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

(Official Seal)

Notary Public
Print Name:
My Commission expires:

Attention *Registry of Deeds/Town or City Clerk:*

Mail to:

Citizens Bank Consumer Finance Operations
480 Jefferson Boulevard
Warwick, RI 02886

TAK REV 11/01

35314 0181

ADI REPORTING SERVICES
A division of Asset Discovery, Inc. Tel: (800) 470-5522 Fax:(888) 470-5522
463 Worcester Road, Suite 305
Framingham, MA 01701
Phone:(800)470-5522
Fax:(888)470-5522

**SCHEDULE A**

**177 Perham Street**
**West Roxburv MA 02132**
**Louis A. Kunian**

**The land with the buildings thereon situated in West Roxbury, Suffolk County, Commonwealth of Massachusetts known and being numbered: 177 Perham Street**

The premises are conveyed subject to and with the benefit of all rights, rights of way, easements, appurtenances, reservations, restrictions, and layouts and takings of record, insofar as they are in force and applicable.

Meaning and intending to mortgage the same premises by deed of Louis Kunian to Louis A. Kunian, Trustee of the 177 Perham Street Realty Trust, dated 06/28/1994 and filed with the Suffolk County Registry of Deeds at Record Book 19331, Page 191; as affected by Confirmatory Deed of Louis Kunian to Louis A. Kunian, Trustee of the 177 Perham Street Realty Trust, dated 08/27/1997 and filed with said deeds at Record Book 21699, Page 154; as affected by Subsequent Transfer of Louis A. Kunian, Trustee of 177 Perham Street Realty Trust to Louis A. Kunian, dated 08/27/1997 and filed with said deeds at Record Book 21699, Page 155; wherein a more detailed description of the premises is set forth.

Filed with:

**SUFFOLK COUNTY REGISTRY OF DEEDS**
One Pemberton Square Boston MA
Tel: (617) 725-8575

When recorded, please return to:

**Citizens Bank**

Document Control Office
Citizens Bank Document Control
One Citizens Drive
Riverside, RI 02915

Discrepancy Codes:
**03, 10, 20**

Cust Ref #: 4659152
ADI Ref #: 40622-70



Report Ordered: 06/22/2004
Report Furnished: 07/13/2004

Printed On: 9:50:33AM, 8/23/2004

# ADJUSTABLE RATE NOTE
## (LIBOR One-Year Index (As Published In *The Wall Street Journal*)–Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| February 28, 2005 | ANDOVER | Massachusetts |
| --- | --- | --- |
| *[Date]* | *[City]* | *[State]* |

177 PERHAM STREET, WEST ROXBURY, MA 02132
*[Property Address]*

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 300,800.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is DREW MORTGAGE ASSOCIATES, INC.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.375 %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on April, 2005 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on March 1, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at DREW MORTGAGE ASSOCIATES, INC., 196 BOSTON TURNPIKE ROAD, SHREWSBURY, MA 01545 or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 1,876.61 . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of March, 2008 , and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

LOAN NUMBER: [redacted] [redacted]



ALLONGE ATTAC

EXHIBIT
E

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and 750/1000ths percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 8.375 % or less than 4.375 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 12.375 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 3.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the


©2001, The Compliance Source, Inc.

interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.
>
> To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

LOAN NUMBER: [redacted] [redacted]


©2001, The Compliance Source, Inc.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____________________ (Seal)
LOUIS A KUNIAN -Borrower

_____________________ (Seal)
-Borrower

_____________________ (Seal)
-Borrower

_____________________ (Seal)
-Borrower

*[Sign Original Only]*

LOAN NUMBER: [redacted] [redacted]


©2001, The Compliance Source, Inc

**LENDER:** DREW MORTGAGE ASSOCIATES, INC.

**BORROWER:** LOUIS A KUNIAN

**PROPERTY:** 177 PERHAM STREET, WEST ROXBURY, MA 02132

**LOAN NO./MIN** [redacted] / [redacted]

# ENDORSEMENT ALLONGE TO NOTE

This Allonge to Note is to that certain Note dated February 28, 2005 , executed by LOUIS A KUNIAN

in the amount of $ 300,800.00 , in favor of DREW MORTGAGE ASSOCIATES, INC.

as payee. This Allonge is affixed and becomes a permanent part of said Note.

Cleveland, Ohio ____________ 20 ___
PAY TO THE ORDER OF
____________________
Without Recourse
OHIO SAVINGS BANK
fka OHIO SAVINGS BANK, F.S.B.
BY: ____________________
Stacey Koster
Authorized Agent

PAY TO THE ORDER OF

OHIO SAVINGS BANK

WITHOUT RECOURSE.

LENDER: DREW MORTGAGE ASSOCIATES, INC.

By: ____________________ Date: February 28, 2005

Name: Bruce Rawan

Title: President


©1999, All Rights Reserved

Bk: 36582 Pg: 47

17

2005 00029118

Bk: 36582 Pg: 47 Doc: MTG
Page: 1 of 17 03/02/2005 03:04 PM

**After recording please return to:**
OHIO SAVINGS BANK ATTN: DOCUMENT CONTROL

*[Company Name]*

*[Name of Natural Person]*

1111 CHESTER AVE
*[Street Address]*

CLEVELAND, OH 44114
*[City, State Zip Code]*

*[Space Above This Line For Recording Data]*

# MORTGAGE

MIN: [redacted]

177 Perham Street, West Roxbury

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated February 28, 2005, together with all Riders to this document.

(B) **"Borrower"** is LOUIS A. KUNIAN

. Borrower is the mortgagor under this Security Instrument.

(C) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) **"Lender"** is DREW MORTGAGE ASSOCIATES, INC.

Lender is a corporation organized and existing under the laws of THE STATE OF MASSACHUSETTS. Lender's address is 196 BOSTON TURNPIKE, SHREWSBURY, MA 01545.

(E) **"Note"** means the promissory note signed by Borrower and dated February 28, 2005. The Note states that Borrower owes Lender three hundred thousand eight hundred and NO/100ths Dollars (U.S. $ 300,800.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than March 1, 2035.

LOAN NUMBER: [redacted]


©2003, The Compliance Source, Inc.

EXHIBIT F

**(F)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)** "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower *[check box as applicable]*:

| | | |
|---|---|---|
| [XX] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] 1-4 Family Rider | [ ] Revocable Trust Rider | |
| [ ] Other(s) *[specify]* | | |

**(I)** "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** "**Escrow Items**" means those items that are described in Section 3.

**(M)** "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.


©2003, The Compliance Source, Inc.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

County of SUFFOLK :
*[Type of Recording Jurisdiction]* *[Name of Recording Jurisdiction]*

SEE ATTACHED EXHIBIT A

which currently has the address of 177 PERHAM STREET
*[Street]*
WEST ROXBURY , Massachusetts 02132 ("Property Address"):
*[City]* *[Zip Code]*

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check,


©2003, The Compliance Source, Inc.

bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.


©2003, The Compliance Source, Inc.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

LOAN NUMBER: [redacted]


©2003, The Compliance Source, Inc.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has


©2003, The Compliance Source, Inc.

released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable


©2003, The Compliance Source, Inc.

loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise


©2003, The Compliance Source, Inc.

agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment


©2003, The Compliance Source, Inc.

without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall


©2003, The Compliance Source, Inc.

continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary,


©2003, The Compliance Source, Inc.

Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtsey and dower in the Property.

*[Signatures on Following Page]*


©2003, The Compliance Source, Inc.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

George A Rand ______ LOUIS A KUNIAN (Seal)
-Borrower
*[Printed Name]*

______ ______ (Seal)
-Borrower
*[Printed Name]*

______ (Seal)
-Borrower
*[Printed Name]*

______ (Seal)
-Borrower
*[Printed Name]*

*[Space Below This Line For Acknowledgment]*

State of Massachusetts §
§
County of Suffolk §

On this 27th day of February, 2005, before me, the undersigned notary public, personally appeared LOUIS A KUNIAN,

proved to me through satisfactory evidence of identification, which were ______, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose.

(Seal)

Signature George A. Rand

My Commission expires 9-17-10

GEORGE A. RAND
Notary Public
Commonwealth of Massachusetts
My Commission Expires Sep 17, 2010


©2003, The Compliance Source, Inc.

# ADJUSTABLE RATE RIDER

## (LIBOR One-Year Index (As Published In *The Wall Street Journal*)–Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 28th day of February, 2005, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to DREW MORTGAGE ASSOCIATES, INC. (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

177 PERHAM STREET, WEST ROXBURY, MA 02132

*[Property Address]*

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of 6.375 %. The Note provides for changes in the interest rate and the monthly payments as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of March, 2008, and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal.* The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.


©2001, The Compliance Source, Inc.

(C) **Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and 750/1000ths percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) **Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 8.375 % or less than 4.375 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 12.375 %. .

(E) **Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) **Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.


©2001, The Compliance Source, Inc.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

| | |
|---|---|
| _____ (Seal)<br>LOUIS A KUNIAN -Borrower | _____ (Seal)<br>-Borrower |
| _____ (Seal)<br>-Borrower | _____ (Seal)<br>-Borrower |

LOAN NUMBER: [redacted]


©2001, The Compliance Source, Inc.

Exhibit A

The land at 177 Perham Street, West Roxbury, Suffolk County, Massachusetts, being shown as Lot 133 and a portion of Lot 132 on a plan entitled "Plan of Land, Boston, Mass." (West Roxbury District), by George C. Hallisey, Surveyor, dated December 11, 1954, recorded with Suffolk County Registry of Deeds, Book 7028, Page 39, and to which reference is hereby made for a more particular description of said premises.

Being the same premises conveyed to the herein named mortgagor (s) by deed recorded with Suffolk County Registry of Deeds in Book 21699, Page 155.

A. **Settlement Statement** — U.S. Department of Housing And Urban Development — OMB Approval No. 2502-0265

| B. Type of Loan | 6. File Number: | 7. Loan Number: | 8. Mortgage Ins. Case No.: |
|---|---|---|---|
| Conv. Unins. | K-268-5 | [redacted] | |

C. **Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. Name and Address of Borrower:
LOUIS A. KUNIAN, 177 Perham Street, West Roxbury, MA 02132

F. Name and Address of Lender:
Drew Mortgage Associates, Inc.
196 Boston Turnpike Road
Shrewsbury, MA, 01545

E. Name and Address of Seller:

Seller's TIN#:

G. Property Location:
177 Perham Street
West Roxbury, MA 02132

H. Settlement Agent:
Rand & Youmatz, P.C.

Place of Settlement:
2 Stevens Street, Andover, MA 01810

City/Cnty of Settlement: Andover/Essex

Tin #: 04-3251753
I. Settlement Date:
February 28, 2005

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due to Seller** | |
| 101. Contract Sales Price | $0.00 | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to borrower (line 1400) | $4,322.96 | 403. | |
| 104. Payoff 1. Chase Manhattan Mortgage Corporation | $189,309.67 | 404. | |
| 105. Payoff 2. Citizens Bank | $35,317.74 | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/Town taxes to | | 406. City/Town taxes to | |
| 107. County Taxes to | | 407. County Taxes to | |
| 108. Assessments to | | 408. Assessments to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross Amount Due From Borrower** | $228,950.37 | 420. Gross Amount Due to Seller | |
| **200. Amounts Paid By Or In Behalf Of Borrower** | | **500. Reductions In Amount Due to Seller** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | $300,800.00 | 502. Settlement Charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff 1. | |
| 205. | | 505. Payoff 2. | |
| 206. | | 506. to | |
| 207. | | 507. to | |
| 208. | | 508. to | |
| 209. | | 509 to | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes to | | 510. City/town taxes to | |
| 211. County Taxes to | | 511. County Taxes to | |
| 212. Assessments to | | 512. Assessments to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | $300,800.00 | **520. Total Reduction Amount Due Seller** | |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross amount due from borrower (line 120) | $228,950.37 | 601. Gross amount due to seller (line 420) | |
| 302. Less Amount paid by/for borrower (line 220) | ($300,800.00) | 602. Less amount paid by/for seller (line 520) | |
| 303. CASH TO BORROWER: | $71,849.63 | 603. CASH FROM SELLER: | |

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained in Blocks E,G,H and I and on line 401 (or if line 401 is asterisked, lines 403 and 404) is important tax information and is being furnished to the Internal Revenue Service.
If you are required to file a return, a negligence penalty or other sanction will be imposed on you, if this item is required to be reported and the IRS determines that it has not been reported.
SELLER INSTRUCTIONS: If this real estate was your principal residence, file Form 2110, Sale or Exchange of Principal Residence, for any gain, with your income tax return: for other transactions, complete the applicable parts of Form 4797, Form 8252 And/or Schedule D (Form 1040). You are required by law to provide (see Box H) with your correct taxpayer identification number. If you do not provide [see box H) with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law, and under penalties of perjury. I certify that the number shown on this statement is my correct taxpayer identification number.

Seller's Signature



EXHIBIT G

## L. Settlement Charges

| | | POC | Paid From Borrowers Funds at Settlement | Paid From Sellers Funds at Settlement |
|---|---|---|---|---|
| **700. Total Sales/Broker's Commission based on [illegible] $0.00 @ % =** | | | | |
| Division of Commission (line 700) as follows: | | | | |
| 701. | to | | | |
| 702. | to | | | |
| 703. Commission paid at Settlement | | | | |
| 704. | | | | |
| **800. Items Payable In Connection With Loan** | | | | |
| 801. Loan Origination fee | % | | | |
| 802. Loan Discount | % | | | |
| 803. Appraisal Fee | to First Fidelity | | $300.00 | |
| 804. Credit Report Fee | to Factual Data | | $49.00 | |
| 805. Yield Spread Premium | to Drew Mortgage Associates, Inc. | $7,896.00 | | |
| 806. Administrative Fee | to Ohio Savings Bank | | $200.00 | |
| 807. Loan Setup Fee | to Ohio Savings Bank | | $215.00 | |
| 808. Flood Certification Fee | to First American | | $10.00 | |
| 809. Processing Fee | to Drew Mortgage Associates, Inc. | | $110.00 | |
| 810. Document Preparation Fee | to Drew Mortgage Associates, Inc. | | $155.00 | |
| 811. | to | | | |
| 812. | to | | | |
| 813. | to | | | |
| 814. | to | | | |
| **900. Items Required By Lender To Be Paid In Advance** | | | | |
| 901. Interest from | 3/4/2005 to 3/1/2005 @ 52.5400 /day -3 Days | | ($157.62) | |
| 902. Mortgage insurance premium for | mo. to | | | |
| 903. Hazard insurance premium for | yrs. to | | | |
| 904. Flood Insurance | yrs. to | | | |
| 905. | | | | |
| **1000. Reserves Deposited With Lender** | | | | |
| 1001. Hazard Insurance | 10 months @ $113.25 per month | | $1,132.50 | |
| 1002. Mortgage Insurance | 0 months @ $0.00 per month | | $0.00 | |
| 1003. City property taxes | 3 months @ $201.61 per month | | $604.83 | |
| 1007. | months @ per month | | $0.00 | |
| 1008. Aggregate Accounting Adjustment | | | ($113.25) | |
| **1100. Title Charges** | | | | |
| 1101. Settlement or closing fee to | | | | |
| 1102. Abstract or title search to | | | | |
| 1103. Title examination to | | | | |
| 1104. Title insurance binder to | | | | |
| 1105. Document preparation to | | | | |
| 1106. Notary fees to | | | | |
| 1107. Attorney's fees to | Rand & Youmatz, P.C. | | $500.00 | |
| *(includes the above items Numbers: )* | | | | |
| 1108. Title insurance to | Old Republic National Title Insurance Company | | $752.50 | |
| *(includes the above items Numbers: )* | | | | |
| 1109. Lender's coverage | $300,800.00 L Prem: $752.50 | Endorsement: $0.00 | | |
| 1110. Owner's coverage | $0.00 O Prem: | | | |
| 1111. | to | | | |
| 1112. | to | | | |
| 1113. Title Ins. Commission to Title Agent $0.00 | to | | | |
| **1200. Government Recording and Transfer Charges** | | | | |
| 1201. Recording fees: | Deed ; Mortgage $175.00 ; Releases $150.00 | | $325.00 | |
| 1202. Recording fees: | Deed ; Mortgage | | | |
| 1203. State tax/stamps: | Deed $0.00 ; Mortgage | | | |
| 1204. Assignment | to | | | |
| 1205. Municipal Lien Certificate and Recording | to | | | |
| **1300. Additional Settlement Charges** | | | | |
| 1301. Survey to N/A | to | | | |
| 1302. Pest inspection | to | | | |
| 1303. Survey Affidavit | to Rand & Youmatz, P.C. | | $75.00 | |
| 1304. Overnight/Wire Fees | to Rand & Youmatz, P.C. | | $65.00 | |
| 1305. Discharge Tracking | to Rand & Youmatz, P.C. | | $100.00 | |
| 1306. | to | | | |
| 1307. | to | | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502 Section K)** | | | $4,322.96 | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrowers

LOUIS A. KONIAN

Sellers

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Settlement Agent: George A. Rand

Date: February 28, 2005

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine or imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.



form HUD – 1 (3/86)

## HUD-1 SETTLEMENT STATEMENT CERTIFICATION

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction.

I further certify that I have received a copy of the HUD-1 Settlement Statement.

SELLER BORROWER

SELLER BORROWER

SELLER BORROWER

SELLER BORROWER

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement.

SETTLEMENT AGENT

2.2015

DATE

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

AFTER RECORDING, RETURN TO:

AmTrust Bank
A Division of New York Community Bank
Attn: D. Wilson
OH98-0504
1111 Chester Avenue
Cleveland OH 44114

Loan [redacted]

[Space Above This Line For Recording Data]

MIN [redacted]

# LOAN MODIFICATION AGREEMENT

This Loan Modification Agreement ("Agreement"), made this 1st day of APRIL, 2010 between LOUIS A KUNIAN ("Borrower") and ("Lender"), **AmTrust Bank a Division of New York Community Bank** and **Mortgage Electronic Registration Systems, Inc.**, ("Mortgagee") amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), and Timely Payment Rewards Rider, if any, dated FEBRUARY 28, 2005 **and granted or assigned to Mortgage Electronic Systems, Inc., as mortgagee of record (solely as nominee for Lender and Lender's successors and assigns), P.O. Box 2026, Flint, Michigan 48501-2026** and recorded in **Document Number 200500029118, Book Number 36582, Page Number 47**, of the **County of Suffolk**, Records of Massachusetts and (2) the Note bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at :

177 PERHAM STREET, WEST ROXBURY, MASSACHUSETTS 02132

*[Property Address]*

the real property described being set forth as follows:

See Attached Exhibit A

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note and Security Instrument):

**MERS Phone: 1-888-679-6377**


©2004, The Compliance Source, Inc
BARCODE

EXHIBIT H

1. As of JUNE 1, 2010 the amount payable under the Note and the Security Instrument (the "Unpaid Principal Balance") is U.S. $284,416.17 consisting of the amount(s) loaned to Borrower by Lender and any interest capitalized to date.

2. The Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of the Lender. Interest will be charged on the Unpaid Principal Balance for the ***first five years*** at the yearly rate of **2.000%**, from JUNE 1, 2010, and Borrower promises to pay in monthly payments of principal and interest, the amount of **$1,014.77** beginning on the **1st day** of JULY, 2010. Beginning on the first day of the ***sixth year***, interest will be charged at the yearly rate of **3.000%** from JUNE 1, 2015 and Borrower shall pay monthly payments of principal and interest in the amount of **$1,142.05** beginning on the **1st day** of JULY, 2015. Beginning on the first day of the ***seventh year***, interest will be charged at the yearly rate of **4.000%** from JUNE 1, 2016 and Borrower shall pay monthly payments of principal and interest in the amount of **$1,273.46** beginning on the **1st** day of **JULY, 2016**. Beginning on the first day of the ***eighth year***, interest will be charged at the yearly rate of **5.000%** from JUNE 1, 2017, and Borrower shall pay monthly payments of principal and interest in the amount of **$1,408.12** beginning on the **1st day** of JULY, 2017. Beginning on the first day of the ***ninth year*** interest will be charged at the yearly rate of 5.125% from JUNE 1, 2018, and Borrower shall pay monthly payments of principal and interest in the amount of $1,424.91 beginning on the **1st day of JULY, 2018** and continuing thereafter until the Maturity Date (as hereinafter defined), and shall continue the monthly payments thereafter on the same day of each succeeding month until principal and interest are paid in full. If on **DECEMBER 1, 2041** (the" Maturity Date"), Borrower still owes amounts under the Note and Security Instrument, as amended by this Agreement, Borrowers will pay these amounts in full on the Maturity Date.

3. If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.

   If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

4. Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other

payments that Borrower is obligated to make under the Security Instrument; however, the following terms and provisions are forever canceled, null and void, as of the date specified in paragraph No. 1 above:

(a) all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note, including, where applicable, the Timely Payment Rewards rate reduction, as described in paragraph 1 of the Timely Payment Rewards Addendum to Note and paragraph A.1. of the Timely Payment Rewards Rider. By executing this Agreement, Borrower waives any Timely Payment Rewards rate reduction to which Borrower may have otherwise been entitled; and

(b) all terms and provisions of any adjustable rate rider, or Timely Payment Rewards Rider, where applicable, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

5. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement.

*[Signatures on Following Page]*

EXECUTED as of the day and year first above written.

(Seal) -Borrower

LOUIS A KUNIAN

(Seal) - Borrower

Witnessed By:

Lisa Park

Signature

Print Name

Signature

Print Name

ACCEPTED AND AGREED TO BY THE OWNER AND HOLDER OF SAID NOTE:

(Seal) -Lender

PAUL HARRIS
First Vice President

(Seal)
Mortgage Electronic Registration Systems, Inc. -Mortgagee

Donna Wilson
Vice President

By:

[Acknowledgment on Following Page]


©2004, The Compliance Source, Inc
BARCODE